# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOHN HENRY GRANDERSON,

        Defendant-Appellant.

UNPUBLISHED
September 13, 2016

No. 325313
Saginaw Circuit Court
LC No. 14-039760-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERRANCE DEMON-JORDAN THOMAS, JR.,

        Defendant-Appellant.

No. 325530
Saginaw Circuit Court
LC No. 14-039757-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KAREEM AMID SWILLEY, JR.,

        Defendant-Appellant.

No. 325806
Saginaw Circuit Court
LC No. 14-039758-FJ

---

Before: TALBOT, C.J., and O'CONNELL and OWENS, JJ.

PER CURIAM.

-1-

These consolidated appeals[1] arise out of the joint jury trial of four defendants for various charges stemming from a shooting that occurred on November 21, 2012. In Docket No. 325313, defendant John Henry Granderson appeals as of right his convictions and sentences of one count of first-degree premeditated murder, MCL 750.316, one count of conspiracy to commit first-degree premeditated murder, MCL 750.157a, three counts of assault with intent to murder (AWIM), MCL 750.83, one count of carrying a dangerous weapon with unlawful intent, MCL 750.226, and six counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Granderson, as a second-habitual offender, MCL 769.10, to concurrent terms of life without parole for murder, life with parole for conspiracy to commit murder, 46 to 69 years' imprisonment for each AWIM count, and 36 to 90 months' imprisonment for carrying a dangerous weapon, to be served consecutively to six concurrent terms of two years' imprisonment for felony-firearm.

In Docket No. 325530, defendant Terrance Demon-Jordan Thomas, Jr. appeals as of right his convictions and sentences of first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, three counts of AWIM, one count of carrying a dangerous weapon with unlawful intent, one count of possession of a firearm by a felon, MCL 750.224f, and seven counts of felony-firearm. The trial court sentenced Thomas to concurrent terms of life without parole for conspiracy to commit murder and first-degree murder, 29 to 45 years' imprisonment for each AWIM count, and 60 to 90 months' imprisonment for carrying a dangerous weapon with unlawful intent and possession of a firearm by a felon, all to be served consecutively to seven concurrent terms of two years' imprisonment for each count of felony-firearm.

In Docket No. 325806, defendant Kareem Amid Swilley, Jr. appeals as of right his convictions and sentences of first-degree premeditated murder, conspiracy to commit murder, three counts of AWIM, one count of carrying a dangerous weapon with unlawful intent, and six counts of felony-firearm. The trial court sentenced Swilley to concurrent terms of life without parole for conspiracy to commit murder, 37 to 75 years' imprisonment for first-degree murder, 18 to 36 years' imprisonment for each AWIM count, 38 to 60 months' imprisonment for carrying a dangerous weapon with unlawful intent, all to be served consecutively to six concurrent terms of two years' imprisonment for felony-firearm.[2]

## I. FACTS

At approximately 2:30 p.m. on November 21, 2012, DaVarion Galvin, Marcus Lively, Willie Youngblood, and Joshua Colley were walking on the sidewalk adjacent to York Street in

---

[1] *People v Granderson*, unpublished order of the Court of Appeals, entered January 27, 2016 (Docket No. 325313).

[2] A fourth defendant, Derell Martin, was acquitted of all charges by the jury and is not a party to this appeal. Granderson, Thomas, and Swilley were also found not guilty of receiving or concealing a stolen firearm, MCL 750.535b.

Saginaw. A dark-colored Saturn pulled up to the group. Youngblood approached the front passenger door, and in his words, got "closer than a mug." Youngblood looked into the vehicle and saw four men. Thomas was seated closest to Youngblood in the front passenger seat. Granderson was in the driver's seat. Swilley was seated behind Thomas, and Martin behind Granderson. Thomas bit his lip and then said, "yeah." The men in the vehicle then opened fire. Youngblood was struck by a bullet that crossed his stomach, but survived. Galvin was struck by several bullets and died from his wounds. Colley and Lively were not injured.

Many of the issues raised on appeal relate to Youngblood's identification of the defendants. In the days that followed the shooting, Youngblood was interviewed by Saginaw Police Detective Ryan Oberle. Oberle presented Youngblood with photographs of several men, including those that were in the vehicle, but Youngblood did not identify anyone. However, in 2013, Youngblood was identified as a suspect in an armed robbery and carjacking that occurred at the Cass River Market. While talking to a Michigan State Police Detective, Randy Kahn, Youngblood identified the four men responsible for the shooting. Kahn contacted Oberle, who spoke with Youngblood the following day. Youngblood again identified the four men while speaking to Kahn. Youngblood, accompanied by an attorney, met with Oberle again and gave what was referred to at trial as the proffer statement. In this statement, Youngblood again identified Granderson, Thomas, Swilley, and Martin. Youngblood similarly identified these four men at the preliminary examination.

A week before trial, Youngblood told the prosecutor that he did not want to testify. He also asked what the prosecutor could do to protect Youngblood's family. Youngblood did testify at trial. But when asked by the prosecutor to identify those responsible, Youngblood testified that he saw only "dreads and a gun" before turning and running away from the Saturn. Youngblood, however, acknowledged that he had identified the men responsible on several occasions. The prosecutor confronted Youngblood with his preliminary examination testimony. Youngblood agreed that his preliminary examination testimony was truthful.

On cross-examination, Youngblood wavered, claiming his knowledge of who was in the car came only from what he heard from others. But on redirect by the prosecutor, Youngblood confirmed that he had identified the men in his conversations with Kahn and Oberle, as well as at the preliminary examination. He also testified that he could have identified these four before he spoke to Kahn and could identify them presently, but was unsure if he wanted to do so. The prosecutor read portions of Youngblood's statement to Oberle into the record, in which Youngblood told Oberle that he had seen each of the men responsible. Youngblood agreed that he did, in fact, make these statements. He testified that from the day of the shooting, "it looked like them," referring to Granderson, Thomas, Swilley, and Martin. Youngblood later testified that his ability to identify the four men responsible was based both on what he heard from others and on what he saw on November 21, 2012.

## A. SUFFICIENCY OF THE EVIDENCE

Granderson first argues that the evidence was insufficient to support his convictions. We disagree. A challenge to the sufficiency of the evidence is reviewed de novo on appeal.[4] This Court "reviews the evidence in the light most favorable to the prosecution."[5] This Court "must determine whether a rational trier of fact could find that the evidence proved the essential elements of the crime beyond a reasonable doubt."[6]

Granderson first contends that there was insufficient evidence to identify him as one of the four men in the Saturn. Although Youngblood's testimony on this point was inconsistent, he did eventually identify Granderson as the driver of the vehicle. His statement to Kahn, during which he identified Granderson, was admitted as substantive evidence. Further, his preliminary examination testimony, in which he also identified Granderson as the driver of the vehicle, could be used as substantive evidence because it was a prior inconsistent statement made under oath.[7] In addition, circumstantial evidence supported the jury's conclusion that Granderson was involved in the shooting. Granderson was seen in the vehicle used to commit the crime a few hours before it occurred. His fingerprint was found on the exterior of the car. There was extensive evidence demonstrating that the shooting was the result of retaliatory gang violence, providing Granderson with a motive to commit the offense. Viewing the evidence in a light most favorable to the prosecutor, as this Court must, the evidence was sufficient to identify Granderson as one of the four men responsible for the shooting.[8]

Granderson also contends that there was insufficient evidence to demonstrate premeditation. "A conviction of first-degree premeditated murder requires evidence that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate."[9] "Premeditation and deliberation require sufficient time to allow the defendant to

---

[3] In a supplemental brief, Granderson raises two additional issues that we do not discuss here because these additional issues are identical to issues raised by other defendants. We note where Granderson has joined those positions later in this opinion.

[4] *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010).

[5] *Id.* at 175.

[6] *Id.*

[7] See MRE 801(d)(1) (a prior statement of the witness is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . .").

[8] *People v Watson*, 245 Mich App 572, 594; 629 NW2d 411 (2001).

[9] *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (quotation omitted).

take a second look."[10]  Taking the evidence in a light most favorable to the prosecutor, the record shows that through Ricky Holmes, another member of their gang, Granderson and the other men obtained a borrowed vehicle.  They then drove in the area where they expected to find their target or targets.  When the car encountered Youngblood's group, Youngblood approached the car.  Thomas stated, "yeah," and the shooting began.  After the attack, Thomas and Swilley essentially celebrated Galvin's death through a number of text messages.  From this sequence of events, a rational juror could easily conclude that the men planned the attack well in advance, and after confirming they had found their target or targets, began firing, intending to kill one or more of the men they encountered.  There was ample evidence from which a rational juror could find the murder was premeditated and deliberate.[11]

Granderson also contends that the verdict was against the great weight of the evidence and resulted in a miscarriage of justice.  But he gives no additional explanation for this assertion other than his claim that the evidence was insufficient to sustain his convictions.  For the reasons explained, Granderson fails to demonstrate that the evidence was insufficient to support his convictions.  His claim that the verdict is against the great weight of the evidence likewise fails.

## B.  GANG-RELATED PHOTOGRAPHS AND OTHER EVIDENTIARY MATTERS

Granderson next argues that photographs of various individuals, including his codefendants, making gang signs with their hands were irrelevant and unfairly prejudicial.  We disagree.  A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion.[12]  "An abuse of discretion occurs when the trial court chooses an outcome falling outside the permissible principled range of outcomes."[13]  Where the admission of evidence turns on a question of law, "e.g., whether a rule of evidence or statute precludes admissibility of the evidence[,]" this Court reviews that question of law de novo.[14]  "[I]t is an abuse of discretion to

---

[10] *Id.* (quotation omitted).

[11] Even if he did not fire a weapon, Granderson bears the same criminal responsibility for the shooting under an aiding and abetting theory.  See MCL 767.39 ("Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.").  Granderson contends that if anything, the record demonstrates only that he was merely present.  Certainly, one's mere presence is insufficient to establish that a defendant aided or abetted in the commission of a crime.  *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999).  But here, the evidence demonstrated that Granderson was not merely present.  Rather, he drove the group to and from the shooting.

[12] *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

[13] *People v Smith*, 482 Mich 292, 327; 754 NW2d 284 (quotation omitted).

[14] *Lukity*, 460 Mich at 488.

admit evidence that is inadmissible as a matter of law."[15]  A trial court's decision on a close evidentiary question generally cannot be an abuse of discretion.[16]

Granderson contends that these photographs were not admissible because the prosecutor failed to prove that Granderson was a member of the East Side, a.k.a. Right Back Blood Gang. Generally, all relevant evidence is admissible.[17]  Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[18]  "Proof of motive in a prosecution for murder, although not essential, is always relevant . . . ."[19]  Evidence concerning gang membership is relevant when there is evidence that the crime is gang-related.[20] But it is improper to introduce evidence "to show that, on a particular occasion, a gang member acted in conformity with character traits commonly associated with gang members."[21]

Contrary to Granderson's contention, the prosecutor presented substantial evidence demonstrating that he was a member of the East Side, a.k.a. Right Back Blood Gang.  Several witnesses testified to this fact.  Granderson's name was listed in Swilley's cell phone directory preceded by the initials "RBBG," or Right Back Blood Gang.  A document was also admitted into evidence which listed Granderson as a member of this gang.  Further, the very photographs that Granderson takes issue with were admitted to show that he was a member of the East Side, a.k.a. Right Back Blood Gang.

Granderson also claims that there was no evidence demonstrating that the shooting was gang-related.  This claim is equally without merit.  The prosecutor introduced evidence indicating that the shooting was in retaliation for the murder of Tay Darby.  This pattern of retaliatory violence was further reinforced by evidence that on Christmas day, Swilley's home was fired upon, apparently prompting Swilley, Thomas, and others to attempt to retaliate.  The trial court did not abuse its discretion by allowing photographic evidence that tended to show Granderson was a member of the East Side, a.k.a. Right Back Blood Gang.

Granderson suggests that the evidence was unfairly prejudicial.  Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[22]  But all relevant evidence is inherently

---

[15] *Id*.

[16] *People v Coy*, 258 Mich App 1, 13; 669 NW2d 831 (2003).

[17] MRE 402.

[18] MRE 401.

[19] *People v Rice*, 235 Mich App 429, 440; 597 NW2d 843 (1999).

[20] *People v Bynum*, 496 Mich 610, 625-626; 852 NW2d 570 (2014).

[21] *Id*. at 630.  See also MRE 404(a).

[22] MRE 403.

prejudicial, and "unfair prejudice" is not akin to "damaging."[23] In this case, there was substantial evidence indicating that the shooting was part of a pattern of retaliatory gang violence. Given the evidence regarding Granderson's gang membership, this evidence was likely very damaging to his case. But Granderson has not shown any reason to believe that the evidence was *unfairly* prejudicial. And in any case, the trial court instructed the jury during trial that Granderson and his codefendants were not being charged with being in a gang; rather, the evidence was being offered to show motive. "Jurors are presumed to follow their instructions . . . ."[24] Given the highly probative value of the evidence, and the instructions provided to the jury, in no sense was the probative value of the evidence substantially outweighed by the risk of unfair prejudice.

Granderson further contends that the trial court erred by allowing several witnesses to testify as fact and expert witnesses. He also claims he was entitled to a jury instruction regarding the dual role of these witnesses. However, there is no prohibition against an expert witness providing both fact testimony and expert opinion testimony.[25] And because the trial court gave a proper instruction with regard to expert opinion testimony, there was no need for any further instruction.[26]

## C. PRIOR CONSISTENT STATEMENT

Granderson next argues that the trial court erred by allowing the prosecutor to introduce the video recording of Youngblood's statement to Kahn as a prior consistent statement. We disagree.

"The admission of a prior consistent statement through a third party is appropriate if the requirements of MRE 801(d)(1)(B) are satisfied."[27] Four elements must be established to admit the prior consistent statement:

(1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.[28]

---

[23] *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod on unrelated grounds 450 Mich 1212 (1995).

[24] *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011).

[25] See, e.g., *United States v Lopez-Medina*, 461 F3d 724, 743 (CA 6, 2006) (police officer could testify as both a fact and expert witness).

[26] *Lopez-Medina*, 461 F3d at 743.

[27] *People v Jones*, 240 Mich App 704, 706; 613 NW2d 411 (2000).

[28] *Id*. at 707 (quotation marks and citations omitted).

Granderson briefly argues that Youngblood's statement to police was not consistent with prior testimony, and thus, the third element is not satisfied. Youngblood's testimony at trial was itself inconsistent, but he did eventually identify the four men responsible for the shooting. His statement to Kahn was consistent with these portions of his trial testimony.

The main focus of Granderson's argument is whether, at the time of Youngblood's statement to Kahn, he had a motive to falsify. According to Granderson, at the time Youngblood spoke with Kahn, Youngblood was offering any information he could in order to escape or mitigate his potential criminal liability for the Cass River Market incident. Granderson argues that because this motive existed, Youngblood's statement was not admissible as a prior consistent statement. Granderson is incorrect.

As this Court has explained, a prior consistent statement does not become inadmissible because *any* motive to falsify existed at the time it was made. Rather, the question is whether the prior statement was made before or after the specific motive alleged to have influenced the testimony arose.[29] Here, counsel for the defendants implied several motives to falsify. In opening statements and in questions posed to Youngblood, counsel implied that Youngblood named the individuals because he had been charged with crimes arising from the Cass River Market incident. They also implied that Youngblood's attorney directed Youngblood how he should testify when Youngblood gave the proffer statement. They further suggested that his testimony was improperly influenced by a deal he received from the prosecutor, in that if he did not testify as the prosecutor wished, he would lose the deal.[30]

All of these motives arose only after Youngblood spoke to Kahn. At the time Youngblood spoke to Kahn, he had not been charged. The proffer statement likewise occurred after Youngblood spoke with Kahn. The deal struck with the prosecutor came about after the proffer statement. The motive Granderson points to on appeal may have existed prior to the statement to Kahn. But it is not enough that there be *any* possible motive to falsify prior to or at the time of the statement.[31] Given that there were several charges of improper influences and motives to falsify, many of which arose only after Youngblood spoke with Kahn, the trial court did not abuse its discretion in allowing the prosecutor to present the video recording of the interview as a prior consistent statement.

## D. CHRISTMAS DAY SHOOTING

Granderson next contends that evidence concerning events that occurred on December 25, 2012, was not relevant because he was not involved in those events. We disagree.

---

[29] See *Jones*, 240 Mich App at 711 (holding that any motive is insufficient; rather, "the motive in the second element must be the same motive in the fourth element of the four-pronged test to admit a prior consistent statement under MRE 801(d)(1)(b)").

[30] Youngblood had not been sentenced at the time he testified in this matter.

[31] *Jones*, 240 Mich App at 711.

At about 10:30 p.m. on December 25, 2012, several shots were fired into Swilley's home. Approximately an hour later, an individual called police, reporting that she saw several men walking near her home, armed with long guns. Police responded and spotted four or five men. The men ran from one officer. However, three of these men, two of whom were Swilley and Thomas, were stopped by another officer. A fourth suspect escaped, but was seen throwing a 9mm Glock pistol as he ran. Under the porch of an abandoned home located across the street from where the Glock was found, officers recovered two assault rifles. Ballistics evidence linked the 9mm Glock to the November 21, 2012 shooting, and DNA recovered from the gun matched Thomas's DNA.

Regardless of whether Granderson was involved in the events that occurred on December 25, 2012,[32] the events that occurred on this date were relevant in two respects. First, it explained how officers recovered the Glock pistol, which helped link Thomas to the shooting at issue in this matter. Second, it further demonstrated that the November 21, 2012 shooting was part of an overall pattern of retaliatory gang violence between rival gangs. This supported the prosecutor's theory of motive. Again, motive is always a relevant consideration in a murder trial.[33] The trial court did not abuse its discretion by admitting evidence of the events that occurred on December 25, 2012.

## E. LIVELY'S STATEMENT

Granderson's next claim of error arises from a statement Lively made to officer Bradley Holp. Holp responded within minutes of the shooting and attended to Galvin. While he did so, Lively told Holp that the suspects were in a blue or black Saturn. Granderson contends that because Lively did not testify at trial, admission of this statement violated his Sixth Amendment right to confront the witnesses against him. We disagree. While Granderson challenged admission of this statement on hearsay grounds, he did not raise a constitutional challenge in the trial court. Accordingly, we review the issue for plain error affecting substantial rights.[34] To be entitled to relief, Granderson must demonstrate that an error occurred, that the error was plain, and that the error affected the outcome of the trial.[35]

The introduction of *testimonial*, out-of-court statements violates the confrontation clause of the Sixth Amendment, unless the declarant appears at trial or the defendant had a prior opportunity to cross-examine the declarant.[36] However, Lively's remark was not testimonial.

---

[32] There was evidence indicating that Granderson was the unknown suspect who fled from police on December 25, 2012. Cell phone records indicated that immediately after his home was fired upon, Swilley contacted Thomas and Granderson. Given that Swilley was later found with Thomas, one could easily infer that Granderson was the man who escaped.

[33] *Rice*, 235 Mich App at 440.

[34] *People v Henry (After Remand)*, 305 Mich App 127, 152-153; 854 NW2d 114 (2014).

[35] *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

[36] *People v Nunley*, 491 Mich 686, 698; 8231 NW2d 642 (2012).

"Statements are testimonial if the 'primary purpose' of the statements or the questioning that elicits them 'is to establish or prove past events potentially relevant to later criminal prosecution.' "[37]  As the United States Supreme Court has explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[38]

Lively's remark was entirely unsolicited.  It also appears that it was made in an effort to assist Holp in responding to an ongoing emergency.  The still-armed suspects were likely in the immediate area, and Lively's description would have helped police find the men, who may have been a threat to others.  Under the circumstances, Lively's remark cannot be considered testimonial, and the confrontation clause is not implicated.[39]

## F.  INSTRUCTIONAL ERROR

Granderson argues that the trial court erred by refusing to give several instructions he requested.  We disagree.  "Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion."[40]  Even if an instructional error occurred, "[m]ere error alone in instructing the jury is insufficient to set aside a criminal conviction.  Instead, a defendant must establish that the erroneous instruction resulted in a miscarriage of justice."[41]

Granderson's fingerprint was recovered from the exterior of the Saturn.  Granderson contests the trial court's refusal to provide Mich Crim JI 4.15, which instructs a jury with respect to fingerprint evidence:

> The prosecutor has introduced evidence about fingerprints.  You may consider this evidence when you decide whether the prosecutor has proved beyond a reasonable doubt that the defendant was the person who committed the

---

[37] *People v Garland*, 286 Mich App 1, 10; 777 NW2d 732 (2009), quoting *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006).

[38] *Davis*, 547 US at 822.

[39] In any event, the remark caused no prejudice to Granderson.  There was no genuine dispute regarding the identity of the vehicle used in the shooting, and thus, Lively's statement was of little additional relevance at trial.

[40] *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007).

[41] *People v Schaefer*, 473 Mich 418, 441-442; 703 NW2d 774 (2005), overruled in part on other grounds *People v Derror*, 475 Mich 316 (2006) (quotation marks and citation omitted).

alleged crime. However, fingerprints matching the defendant's must have been found in the place the crime was committed under such circumstances that they could only have been put there when the crime was committed.

The reason for this instruction is to comport with the general rule that where fingerprint evidence is the *sole* evidence of identity, it is sufficient to establish identity only if the fingerprints are found at the scene of the crime and could only have been made at the time of the commission of the crime.[42] Thus, the use note accompanying the instruction directs the trial court that this instruction "should be given only where the sole evidence of identity comes from fingerprints." Here, Granderson's fingerprint was only one small part of the substantial evidence identifying him as the driver of the Saturn. Accordingly, the instruction was not warranted.

Granderson's next claim of error arises out of a requested modification of the instruction on mere presence, Mich Crim JI 8.5. This instruction is found in the chapter of the model instructions regarding aiding and abetting a crime. In its standard form, this instruction provides: "Even if the defendant knew that the alleged crime was planned or was being committed, the mere fact that [he / she] was present when it was committed is not enough to prove that [he / she] assisted in committing it."[43] In other words, the instruction explains to the jury that one is not guilty under an aiding and abetting theory simply because they are present during the commission of the crime. Granderson requested that the instruction be modified to include an instruction that mere association with criminals is likewise insufficient, but the trial court declined to give the instruction. Instead, it provided the model instruction.

"[I]nstructions do not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights."[44] The import of Granderson's requested alteration was that it would be improper to convict him under an aiding and abetting theory simply because he associated with the other men. On appeal, Granderson argues that the instruction was warranted by our Supreme Court's holdings in *People v Sobczak*[45] and *People v Blakes*,[46] both of which stand for the premise that one's mere association with criminals is insufficient to support a conspiracy conviction.[47] Granderson's requested modification to Mich Crim JI 8.5 conflated an aiding and abetting theory of criminal liability with the charge of conspiracy that he faced. The issue the trial court was addressing when it provided Mich Crim JI 8.5 was the aiding and abetting theory that was placed before the jury. The trial court's instructions properly instructed the jury on this theory, and accordingly, reversal is not warranted.

---

[42] *People v Himmelein*, 177 Mich App 365, 374-375; 442 NW2d 667 (1989); *People v Ware*, 12 Mich App 512, 515; 163 NW2d 250 (1968).

[43] Mich Crim JI 8.5.

[44] *People v Piper*, 223 Mich App 642, 648; 567 NW2d 483 (1997).

[45] *People v Sobczak*, 344 Mich 465; 73 NW2d 921 (1955).

[46] *People v Blakes*, 382 Mich 570; 170 NW2d 832 (1969).

[47] *Sobczak*, 344 Mich at 469; *Blakes*, 382 Mich at 571-576.

Granderson also challenges the trial court's refusal to give an instruction on voluntary manslaughter. A trial court must instruct the jury regarding cognate lesser offenses of the same class or category, so long as the evidence adduced at trial would support a conviction of the lesser offense.[48] "[V]oluntary manslaughter is a cognate lesser included offense of murder."[49] However, the evidence adduced at trial would not support a voluntary manslaughter conviction. Unlike murder, voluntary manslaughter occurs when one kills in a "heat of passion," "caused by adequate provocation."[50] "There cannot be a lapse of time during which a reasonable person could control his passions."[51] There was no evidence that would support a theory that the shooting was conducted in a heat of passion that resulted from adequate provocation. Accordingly, a voluntary manslaughter instruction was not warranted.

## G. PROSECUTORIAL ERROR

Granderson raises several alleged instances of prosecutorial error. We find no error warranting relief. Generally, this Court reviews claims of prosecutorial error "case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial."[52] Unpreserved claims of prosecutorial error are reviewed for plain error affecting substantial rights.[53] And if the prejudicial effect of a prosecutor's comments could have been cured by a timely instruction, no error requiring reversal may be found.[54]

Granderson's first assertion of error, the only instance of alleged error he raised in the trial court, is that the prosecutor misrepresented the evidence by arguing that Youngblood was shown only one lineup. Granderson's counsel believed that Youngblood had been shown two lineups, and objected to the prosecutor's statement for that reason. The trial court addressed the objection by stating that "the jury will recall the facts." It is true that a prosecutor should not, in closing arguments, "mischaracterize the evidence presented . . . ."[55] This is because doing so may mislead the jurors into believing facts that are not true.[56] No such risk arose here. The trial court's statement that the jurors would "recall the facts" clearly informed the jurors that it was their responsibility to make this factual determination. Thus, even assuming the prosecutor was incorrect, any risk that Granderson would not receive a fair trial was alleviated.

---

[48] *People v Hendricks*, 446 Mich 435, 444; 521 NW2d 546 (1994).

[49] *People v Pouncey*, 437 Mich 382, 388; 471 NW2d 346 (1991).

[50] *Id.*

[51] *Id.*

[52] *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

[53] *Id.*

[54] *Id.*

[55] *Id.* at 588.

[56] See *Washington v Hofbauer*, 228 F3d 689, 700 (CA6, 2000).

Granderson's second contention is that the prosecutor improperly argued facts not in evidence by suggesting that Granderson may have been involved in the December 25, 2012 incident. A prosecutor may not argue facts that are not in evidence, but is permitted to "argue reasonable inferences from the evidence."[57] As the prosecutor pointed out to the jury, cell phone records indicated that Swilley called Granderson shortly after someone shot at Swilley's home and spoke with him for nearly a minute. From this evidence, it was a reasonable inference to conclude that Granderson was the man that escaped from police later that evening. Accordingly, the prosecutor's argument was proper.

Third, Granderson contends that the prosecutor "unfairly elicited" from Colley the fact that the defense wanted Colley to testify and that he was housed in jail with the defendants. Granderson claims that the prosecutor's questions that elicited these facts were arguments not based in evidence. Granderson's position is entirely illogical because the prosecutor was not making an argument when he made these statements. Rather, he was asking questions of Colley, thereby introducing these very facts into evidence. The prosecutor was entitled to impeach Colley's testimony by implying that it was influenced by the four defendants. The prosecutor's questions were proper.

Granderson's final argument pertains to the prosecutor's comments regarding Holmes. Outside of the presence of the jury, and under questioning from his own attorney, Holmes testified that he would exercise his right to remain silent under the Fifth Amendment if called to testify. Thus, Holmes was not called as a witness. In closing arguments, Swilley's counsel discussed Holmes in relation to the case. Counsel stated, "It's got to – you got to wonder where is Ricky Holmes. Why wasn't he charged?" In rebuttal, the prosecutor stated:

> Let me go through – Ricky Holmes'[s] name was brought up primarily by Mr. Swilley through [c]ounsel, and there was a question thrown out suggesting that somehow the People had to produce Ricky Holmes in this trial. Where is Ricky Holmes? And it's – I mean each defendant and their counsel know that Ricky Holmes is represented by [c]ounsel. He can't be called here, that it was an impossibility for that to have occurred.

Granderson first claims that it was unclear that attorneys for the defense knew Holmes was represented by counsel and could not be called to testify, and thus, the prosecutor misrepresented facts. By the time of closing arguments, that Holmes was represented and would not testify was made abundantly clear to all except the jury. The prosecutor's statement was accurate.

Granderson also claims that it was improper for the prosecutor to mention that Holmes would not testify because this implied that Holmes would incriminate himself. Granderson correctly notes that "[a] lawyer may not . . . call a witness knowing that he will claim a valid privilege not to testify."[58] This is because there is a risk that the jury will treat the invocation of

---

[57] *Watson*, 245 Mich App at 588.

[58] *People v Giacalone*, 399 Mich 642, 645; 250 NW2d 492 (1977).

the privilege as a confession of guilt, one that cannot be disputed through cross-examination.[59] Granderson contends that the prosecutor's comment had essentially the same effect, in that it encouraged the jury to conclude that Holmes, and by extension, Granderson, was guilty.

Granderson's argument fails for several reasons. First, the prosecutor never informed the jury that Holmes invoked the right against self-incrimination. Rather, the prosecutor only stated that it was impossible for Holmes to appear without explaining why this was the case. Accordingly, Granderson's comparison to circumstances where a witness actually is called and raises the privilege is inapt. Second, the prosecutor was responding to the suggestion that the jury question why Holmes did not appear. "[A]n otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument."[60] And in any event, this argument was not raised in the trial court. Had Granderson raised such an objection, the trial court could have instructed the jury not to infer that Holmes was guilty of a crime because he did not testify. Such an instruction would have cured any possible prejudice to Granderson. Accordingly, Granderson is not entitled to relief.[61]

## III. DOCKET NO. 325530

### A. PRIOR CONSISTENT STATEMENT

In his brief on appeal, Thomas first contends that the trial court erred by admitting Youngblood's statement to Kahn as a prior consistent statement because the statement was made after Youngblood had a motive to fabricate. For the same reasons explained in section II(C) of this opinion, we find no error.

Thomas also contends that Youngblood's first statement to Oberle was made when there was a motive to fabricate, and thus, the admission of portions of this statement was an abuse of discretion. Minimally, this statement was made prior to the proffer statement, during which it was implied Youngblood was coached by counsel to identify the men at trial, and before Youngblood was offered and accepted a sentence agreement with regard to his own criminal charges, which was also argued to have improperly influenced Youngblood's testimony. Accordingly, Youngblood's statements to Oberle were properly admitted by the trial court.

### B. EVIDENTIARY ERROR - RELEVANCE

Thomas contends that the trial court admitted several pieces of irrelevant evidence. We disagree.

---

[59] *Id*.

[60] *People v Kennebrew*, 220 Mich App 601, 608; 560 NW2d 354 (1997). While it appeared that defense counsel was alluding more toward the question of why Holmes was not charged, the question, "where is Ricky Holmes[,]" could also have been interpreted by the jury as asking why he was not called to testify.

[61] *Watson*, 245 Mich App at 586.

Thomas first contends that the trial court should not have admitted evidence that two assault rifles were found near where the Glock pistol was recovered on December 25, 2012. Thomas contends that this evidence was admitted only to inflame the jury, violating MRE 401, 402, 403, and 404(b).

Under MRE 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under MRE 402, relevant evidence is admissible unless otherwise prohibited by law. Under MRE 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 404(a) provides that evidence of a person's character "is not admissible for the purpose of proving action in conformity therewith on a particular occasion," subject to a variety of exceptions not relevant to this appeal. MRE 404(b)(1) similarly prohibits evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." But the rule notes that such evidence "is admissible for other purposes, such as proof of motive . . . [or] knowledge . . . or absence of mistake or accident when the same is material . . . whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case."[62]

The threshold question is whether evidence of the existence of these firearms was relevant. Text messages indicated that the 9mm Glock pistol used in the November 21, 2012 shooting was in Thomas's possession. It was undisputed that the Glock pistol was stolen. That Thomas was part of a group that appeared to be in possession of multiple stolen firearms, including the Glock, on December 25, 2012, was circumstantial evidence that Thomas had actual knowledge that the Glock itself was stolen, and thus, relevant to the charge of possession of a stolen firearm that Thomas faced at trial.[63] Further, the fact that Thomas and others appeared to be out seeking to retaliate with assault rifles immediately after Swilley's home was fired upon was relevant to the prosecutor's theory of motive. The prosecutor's theory was that the November 21, 2012 shooting was part of a pattern of retaliatory gang violence, and the fact that Thomas and others seemed to be seeking to retaliate was relevant to this theory. The existence

---

[62] MRE 404(b)(1).

[63] MCL 750.535b requires a showing that the person charged with a violation had knowledge that the firearm was stolen. In the trial court, the prosecutor noted that in *People v Granderson*, unpublished opinion per curiam of the Court of Appeals, issued August 25, 2011 (Docket No. 297838), unpub op at 5, this Court held that proof of actual knowledge that a firearm was stolen was required to sustain a conviction under MCL 750.535b. The parties treated *Granderson* as binding, and the trial court instructed the jury that actual knowledge was required.

of the assault rifles helped to demonstrate what motive the men had in traveling to the area where they were found. Thus, MRE 401 and 402 were satisfied.[64]

Thomas contends that the admission of this evidence violated MRE 403 because it "was only introduced to suggest to the jury that [Thomas] was a bad person." He similarly contends that this evidence violated MRE 404(b) because it was not admitted for a proper purpose under that rule. The prosecution offered the evidence for different reasons, i.e., knowledge and motive – both proper purposes under MRE 404(b)(1). Further, the trial court provided a specific instruction cautioning the jury to be "very careful to consider" evidence of other crimes or improper acts "for certain purposes." The court instructed the jury that it could not use the evidence to conclude that "the defendant is a bad person or that he is likely to commit crimes." Jurors are presumed to follow their instructions.[65] Given the relevance of the evidence and the trial court's instructions, we cannot conclude that the trial court abused its discretion when it admitted evidence of the assault rifles found on December 25, 2012.

Thomas next contends that the fact that Teresa Jurdem loaned her Saturn to Holmes was irrelevant. This fact was clearly relevant, as it helped establish how defendants acquired the vehicle, which was then used in the shooting. There was evidence that Holmes was a member of the same gang as defendants. Thus, the jury could infer that Holmes acquired the vehicle for use in the crime, a fact that tended to show that the crime was a planned act.[66]

Like Granderson, Thomas contends that photographs of him and others making gang signs were irrelevant. As was the case with Granderson, these photographs were admitted to show Thomas's membership in a particular gang, which was relevant to the issue of motive. The trial court did not abuse its discretion when it admitted the photographs.

## C. SENTENCING ERROR

Thomas contends that the trial court erred by sentencing him to life without the possibility of parole for conspiracy to commit murder. The prosecutor concedes error in this regard. And indeed, our Supreme Court has held that one sentenced for conspiracy to commit

---

[64] Thomas relies heavily on this Court's opinion in *People v Drake*, 142 Mich App 357; 370 NW2d 355 (1985). In *Drake*, this Court reversed a murder conviction, concluding that evidence that the murder weapon was stolen, and that two other weapons, one unregistered and one stolen, were found in the defendant's possession was irrelevant, unfairly prejudicial, and admitted only to show bad character. *Id*. at 359-360. *Drake* is distinguishable, both in that the defendant in *Drake* was not charged with possession of a stolen firearm, and because there was no suggestion that the shooting was motivated by retaliation or gang activity. *Id*. at 358-362.

[65] *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

[66] Thomas also contends that the fact that he had himself borrowed the same vehicle on earlier occasions was irrelevant. This evidence tended to show that Thomas was likely involved in the decision to borrow a car from Jurdem to use later that day.

murder must be sentenced to life with the possibility of parole.[67]   Accordingly, we remand the matter for correction of Thomas's sentence for conspiracy.[68]

## D.  PERJURED TESTIMONY[69]

Thomas contends that Youngblood committed perjury when he identified Thomas and the other men at trial, and that a new trial is required because, although perhaps innocently, the prosecutor presented this false testimony.  We disagree.

It is a violation of due process for the prosecutor to knowingly use false testimony to obtain a conviction or to allow testimony that the prosecutor knows is false to stand uncorrected.[70]   However, there is no evidence that the prosecutor knowingly presented false testimony or allowed testimony he knew to be false to go uncorrected.  It appears that the prosecutor expected Youngblood, consistent with his most recent statements to police and his preliminary examination testimony, to identify the defendants at trial.  When Youngblood hesitated, the prosecutor confronted him with his prior statements, and Youngblood agreed that he had identified Thomas on many prior occasions.  The jury was left to decide whether Youngblood's identification of Thomas was credible.  The record does not support the contention that the prosecutor knowingly presented false testimony or left false testimony uncorrected.

## E.  GREAT WEIGHT OF THE EVIDENCE

Thomas contends that Youngblood was not credible, and that because he was not credible, the verdict was against the great weight of the evidence.  We disagree.  "It is the province of the jury to determine questions of fact and assess the credibility of witnesses."[71]  Thus, as a general matter, questions regarding the credibility of a witness are not sufficient grounds for granting a new trial.[72]  This Court must defer to the jury's credibility determinations "unless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable

---

[67] *People v Jahner (After Remand)*, 433 Mich 490, 504; 446 NW2d 151 (1989).  As is discussed later in this opinion, we have doubts regarding whether the holding of *Jahner* remains good law in light of recent amendments to MCL 750.316.  However, we leave it to our Supreme Court to decide whether to overrule *Jahner*.

[68] Resentencing, however, is not required, as this is an administrative task.  *People v Herndon*, 246 Mich App 371, 393; 633 NW2d 376 (2001).

[69] This and Thomas's remaining issues have been raised in a brief filed pursuant to Administrative Order 2004-6, Standard 4.

[70] *Herndon*, 246 Mich App at 417.

[71] *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998).

[72] *Id*. at 643.

physical facts or defied physical realities . . . ."[73]   It was for the jury to decide whether Youngblood's identification of Thomas was credible.  Thomas fails to show that Youngblood's testimony was deprived of all probative value, entirely unbelievable, or defied physical realities. He thus fails to demonstrate error requiring reversal.

### F.  INEFFECTIVE ASSISTANCE OF COUNSEL

Thomas contends that trial counsel was ineffective for failing to seek separate trials.  We disagree.   A claim of ineffective assistance of counsel "is a mixed question of fact and constitutional law.  A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel."[74] A trial court's factual findings are reviewed for clear error, while the ultimate constitutional issue is reviewed de novo.[75]   However, because Thomas failed to preserve his claim of ineffective assistance of counsel, our review is limited to the existing record.[76]

Criminal defendants do not have the right to separate trials.[77]   "A strong public policy favors joint trials in the interest of justice, judicial economy, and administration."[78]  Severance is only mandated upon a showing that a defendant's substantial rights will be prejudiced, and that severance is necessary to avoid such prejudice.[79]   Thomas contends that counsel should have sought separate trials because this allowed evidence that was irrelevant to the question of his guilt or innocence to be admitted in his trial, causing the jurors to become confused.  However, he fails to identify what evidence would not have been admitted at his trial, had it been conducted separately from that of his codefendants.  In any event, incidental spillover prejudice, which is essentially inevitable in a joint trial, is insufficient to mandate severance.[80]

Thomas also suggests that severance was appropriate because his codefendants suggested that Thomas was one of the men in the Saturn.  While mutually exclusive or irreconcilable defenses between codefendants warrants severance, mere finger-pointing does not.[81]   Thomas has not shown the existence of mutually exclusive defenses.  As he fails to demonstrate that a

---

[73] *Id*. at 645-646 (quotation marks and citation omitted).

[74] *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

[75] *Id*.

[76] *People v Rodgers*, 248 Mich App 702, 713-714; 645 NW2d 294 (2001).

[77] *People v Harris*, 201 Mich App 147, 152; 505 NW2d 889 (1993).

[78] *Id*.

[79] MCR 6.121(C).

[80] *People v Hana*, 447 Mich 325, 349; 524 NW2d 682 (1994).

[81] *Id*. at 349-350.

motion for severance would have been successful, he cannot demonstrate that counsel was ineffective for failing to seek severance.[82]

## G.  JUDICIAL BIAS

Thomas contends that he was denied a fair trial because the trial court's questioning of Colley and detective John Beyerlein deprived him of a fair trial.  We disagree.  With regard to the trial court's questioning of Colley, because the issue was preserved, "[t]he question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo."[83]  "When the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review.  Rather, the judgment must be reversed and the case remanded for a new trial."[84]  Further, this Court should not evaluate Thomas's claims of error standing alone, "but rather consider the cumulative effect of the errors."[85]

In *People v Stevens*, our Supreme Court clarified the scope of an appellate court's inquiry when deciding whether alleged judicial bias warrants a new trial.  Ultimately, the issue is determined by considering "the totality of the circumstances, to determine whether the judge demonstrated the appearance of advocacy or partiality on the whole."[86]  A variety of factors should be considered, including "the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions."[87]  A reviewing court is not limited to these factors, and may also "consider additional factors if they are relevant to the determination of partiality in a particular case."[88]

Where, as here, the claim of bias pertains to judicial questioning of witnesses, this Court's analysis must begin with the recognition that as a general matter, a trial court is permitted to question witnesses.[89]  "[T]he central object of judicial questioning should be to

---

[82] See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003) ("Ineffective assistance of counsel cannot be predicated on the failure to make a frivolous or meritless motion.").

[83] *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

[84] *Id*. at 164.

[85] *Id*. at 171-172.  Because Thomas failed to preserve his challenge with respect to the Court's questioning of Beyerlein, that portion of the issue is reviewed for plain error affecting substantial rights.  *Carines*, 460 Mich at 763-764, 774.

[86] *Stevens*, 498 Mich at 172.

[87] *Id*.

[88] *Id*.

[89] *Stevens*, 498 Mich at 173.  See also MRE 614(b).

clarify."[90]  Thus, "it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information."[91]  The trial court's ability to question witnesses is not without its limits, however.  The court must be careful not to exhibit disbelief of a particular witness, even if unintentional.[92]  The court must also refrain from allowing its personal views on disputed factual issues to become apparent to the jury.[93]

Second, this Court must consider the tone of the questioning, a task that can be difficult given that this Court does "not have the benefit of viewing a trial judge's tone and demeanor first hand."[94]  The Court should examine the "nature of the words used by the judge" to see if the record indicates the existence of "hostility, bias, or incredulity."[95]  But in this regard, it is worth noting that "[j]udicial questioning might be more necessary when a judge is confronted with a difficult witness who refuses to answer questions posed by attorneys or repeatedly responds to those questions with unclear answers . . . ."[96]

Third, this Court must "consider the scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein."[97]  Judicial intervention is more appropriate in a long or complex trial.[98]  "Fourth, and in conjunction with the third factor, a reviewing court should consider the extent to which a judge's comments or questions were directed at one side more than the other."[99]

Finally, "the presence or absence of a curative instruction is a factor . . . ."[100]  Jurors are presumed to follow their instructions, and "a curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct.  Depending on the circumstances, an immediate curative instruction may further alleviate any appearance of advocacy or partiality by the

---

[90] *Stevens*, 498 Mich at 173.

[91] *Id*.

[92] *Id*. at 174.

[93] *Id*.

[94] *Id*. at 174-176.

[95] *Id*. at 176.

[96] *Id*. at 175-176.

[97] *Id*. at 176.

[98] *Id*.

[99] *Id*. at 176-177.

[100] *Id*. at 177.

judge."[101]  But there are cases where judicial conduct is so egregious that a curative instruction cannot "erase the appearance of partiality."[102]

Beginning with the first factor, it is clear that Colley was much more willing to answer questions posed by defense attorneys than by the prosecutor.  It appears that the trial court wished to clarify certain parts of Colley's testimony, mainly in areas where he evaded the prosecutor's questions by denying knowledge.  We do not believe that the trial court intended to express an opinion on Colley's veracity.  However, certain questions posed by the trial court may well have suggested to the jury that the trial court did not believe Colley was forthcoming with the prosecutor.[103]  Even if unintentional, the trial court should not have given the jury the impression that it did not believe Colley.  With regard to Beyerlein, the trial court clearly intended only to clarify the timeline of the events that occurred on December 25, 2012.  Nothing in the trial court's questioning gave even the slightest hint of bias or partiality.

The second factor, the tone and demeanor of the judge, is difficult to discern from the record.  This Court cannot evaluate the tone of voice used by the judge below.  However, it is worth noting that no objection was raised to the trial court's tone.[104]  The record does demonstrate that the trial court pressed Colley on a particular point – whether he had explained to officers that he had no personal knowledge of the information he was providing.[105]  But this appears to be due to the fact that Colley gave evasive answers to the trial court's questions on the subject before finally acknowledging that he had not so informed the officers.  It is true that a trial court "should avoid questions that are intimidating, argumentative, or skeptical."[106]  But as our Supreme Court has explained, "[j]udicial questioning might be more necessary when a judge is confronted with a difficult witness who refuses to answer questions posed by attorneys or repeatedly responds to those questions with unclear answers . . . ."[107]  Colley was precisely such a witness, and as such, the manner of the questioning by the trial court was proper.  With regard to Beyerlein, nothing in the record implies that the trial court's tone was improper.  The trial

---

[101] *Id*.

[102] *Id*. at 177-178.

[103] For example, the trial court's questions regarding whether Colley informed police that he was only relaying information he heard from others would tend to cast doubt on the explanation Colley had given to the prosecutor.  The pursuit of this line of questioning may have lead jurors to believe that the trial court found suspicious Colley's attempt to explain the discrepancies between his trial testimony and his statement to police.

[104] See *Stevens*, 498 Mich at 176 ("[A]n objection by trial counsel may specifically note the inappropriateness of the judge's demeanor in the courtroom, further aiding the appellate court in understanding the tenor of judicial involvement.").

[105] The record demonstrates that the trial court posed this question to Colley, and then interrupted Colley before he could state his answer, asking, "[t]hat wasn't your answer, was it?"

[106] *Stevens*, 498 Mich at 175.

[107] *Id*. at 175-176.

court answered straightforward questions, which Beyerlein answered in a direct manner. No objections were raised to the trial court's tone.

Turning to the third and fourth factors, trial in this matter spanned 18 days, involved four defendants, and a large amount of evidence and testimony. This included eyewitness testimony, expert witnesses, DNA evidence, scientific analysis of bullet casings and weapons, and evidence of other events that bore relevance to this matter. Thus, it was precisely the type of trial, i.e., a long and complex one, in which judicial questioning is more appropriate.[108] Nor was it any surprise that the trial court questioned Colley or Beyerlein, as it had done the same with the majority of those who preceded these men as witnesses, all of whom were called by the prosecution. The trial court's questioning of these witnesses was consistent with what was an established pattern by the trial court. No juror would have found it unusual that the trial court questioned Colley or Beyerlein.

Most importantly, the trial court repeatedly instructed the jury not to consider its questions as providing any sort of indication of the court's opinion of the evidence. In its preliminary instructions to the jury, given before any testimony was heard, the trial court instructed the jury, "I may ask some questions of the witnesses myself. These questions are not meant to reflect my opinion about the evidence. If I ask a question, my only reason would be to ask about things that may not have been fully explored." When the suggestion that the trial court's questioning of Colley was improper was raised, the trial court immediately responded by reminding the jury that it had no stake in the matter and was not interested in the outcome. It gave a similar instruction before asking any questions of Beyerlein, despite the absence of an objection. And in its final instructions, the trial court further explained that it did not intend to exhibit any opinion on the matter, and that if the jurors believed the court had expressed such an opinion, it must be disregarded.

In sum, it is possible that the trial court may have unintentionally exhibited some disbelief of Colley's testimony. However, and with regard to both witnesses, none of the remaining factors lend support for the conclusion that Thomas was deprived of a fair trial. Particularly given the trial court's multiple curative instructions, which the jury is presumed to have followed,[109] considering the totality of the circumstances, Thomas was not denied a fair trial.

IV. DOCKET NO. 325806

A. SUFFICIENCY OF THE EVIDENCE

In his brief on appeal, Swilley first contends that because Youngblood was not credible, the evidence against him was insufficient to support his convictions. It is the province of the jury

---

[108] *Id*. at 176.

[109] *Stevens*, 498 Mich at 177.

to determine questions of fact and assess the credibility of witnesses."[110]  Thus, when reviewing a claim that the evidence was insufficient to support a conviction, this Court "will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses."[111]  Youngblood's credibility was for the jury to determine, and we decline to interfere with its decision.[112]

## B.  GANG-RELATED EVIDENCE

Swilley contends that photographs and other evidence of gang activity were irrelevant because there was no evidence that he was associated with any particular gang.  Contrary to Swilley's position, the prosecutor presented substantial evidence and testimony demonstrating that Swilley was, like the other defendants, a member of the East Side, a.k.a. Right Back Blood Gang.  The prosecutor also admitted substantial evidence tending to demonstrate that the November 21, 2012 shooting was gang-related.  Accordingly, photographic and other evidence of gang signs and activity was relevant.

## C.  EXPERT WITNESS TESTIMONY

Swilley contends that for various reasons, Oberle should not have been allowed to testify as an expert in Saginaw gang territory, membership, and related areas.[113]  We disagree.

At trial, Oberle explained that he had been an officer for 19 years, the last 18 in Saginaw. He explained that nearly his entire career involved investigations into gang activity.  He estimated that in the past 10 years, he had investigated 150 to 200 homicides, and that at least half of those were gang-related.  He had been part of the Gang Task Force in Saginaw.  He also worked as a liaison with a task force operated by the FBI, which focused on gang activity, mainly in Saginaw.  In this capacity, he was assigned a particular gang, the North Side gang, and had a "book with all the people that [he] knew to be gang members, their affiliations, the cars they drove, any time they were stopped, what type of car they were in, who they may have been with, who their girlfriend was, who their baby mama was, anything like that."  His work resulted in 95 federal indictments and an award recognizing his contributions.  He received another award as the result of a long-term investigation into well-known gangs of Saginaw.  Oberle explained

---

[110] *Lemmon*, 456 Mich at 637.

[111] *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

[112] In his Standard 4 brief on appeal, Swilley contends that the evidence admitted at trial was insufficient because after trial, Youngblood recanted his testimony, stating in an affidavit that he lied every time he identified Swilley as one of the men involved.  The fact that Youngblood recanted his trial testimony *after* trial does not demonstrate that the evidence admitted *at* trial was insufficient in any regard.  We address later in this opinion Swilley's contention that a new trial is required due to Youngblood's recantation.

[113] In a supplemental brief, Granderson adopts Swilley's argument verbatim.  Our analysis applies equally to both defendants.

that he had received education through training programs when he was working with the FBI task force.

Swilley first contends that Oberle's qualifications were insufficient. Pursuant to MRE 702, "[i]f the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise . . . ." Swilley contends that Oberle "cited no specific training in Saginaw gang territory," and that his only qualification was through his work with the Gang Task Force. Swilley apparently ignores the bulk of Oberle's qualifications, such as his work with the FBI, his educational training, and his awards. He also essentially ignores Oberle's extensive experience as a police officer who investigated illegal gang activity in Saginaw for 18 years. Given Oberle's extensive experience, knowledge, and training, the trial court did not abuse its discretion when it found Oberle qualified to testify as an expert in the area of Saginaw gang activity.

Swilley next contends that Oberle's opinion testimony was inadmissible because it was derived from unreliable data. MRE 702 requires that an expert's testimony "be based on sufficient facts or data[.]" Oberle's knowledge of the meaning of different gang signs came from his experience working in Saginaw. He explained that his opinion regarding the gang affiliations of individual people was based on "the people that they hangout [sic] with, areas that they hangout [sic], signs that they've flashed, signs that they flashed up, signs that they flashed down. That's indicative of where they live, who they affiliate with and who they're not friendly with . . . ." Oberle was also able to provide a detailed account of the history of gang activity in Saginaw, which was clearly derived from his experience as an officer. Oberle's testimony was sufficiently grounded in reliable facts and data.

Swilley further contends that the trial court erred when it did not perform a "searching inquiry" of the data he relied on to determine whether Oberle's interpretations from that data were reliable. He argues that the record "is devoid of anything to establish the scientific methodology behind Oberle's expertise." Swilley's argument is misplaced because Oberle's opinions were not based on a scientific analysis of data, i.e., the application of a scientific methodology to established facts. Rather, as Oberle explained, his opinions were derived from his extensive experience with Saginaw gang activity.[114] Oberle's experience provided a sufficient basis for his opinions.

---

[114] Swilley seems to contend that the trial court was required to apply the factors described in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 589; 113 S Ct 2786; 125 L Ed 2d 469 (1993), before admitting Oberle's opinion. These factors generally describe questions relevant to expert testimony based in scientific methodology, such as whether the methods utilized have been tested and subject to peer review, whether the methods have a known error rate, whether there are applicable standards governing the application of the methods, and the like. *Id*. The trial court's gatekeeping function must be considered in context. *Lenawee Co v Wagley*, 301 Mich App 134, 163; 836 NW2d 193 (2013). Here, Oberle's opinion was not based in science, but in

Swilley also contends that the areas in which Oberle provided his opinions were common knowledge, and thus, his opinion was unnecessary. In a similar vein, he contends that Oberle's opinions were irrelevant. If an average juror does not need the assistance of an expert to understand the evidence or determine a fact in issue, expert testimony on the issue is not admissible.[115] It is also true that "an expert witness may not testify about matters that are irrelevant."[116] Our Supreme Court has explained that "expert testimony about gang membership is of little value to a fact-finder *unless* there is a connection between gang membership and the crime at issue."[117] "Sometimes, however, identifying whether a crime is gang-related requires an expert to establish the significance of seemingly innocuous matters—such as clothing, symbolism, and tattoos—as features of gang membership and gang involvement."[118] Expert testimony may also be necessary to explain gang territories, because such evidence may help explain that a crime was motivated by gang affiliations.[119] "In other words, understanding the connection between the crime and gang activity is sometimes beyond the ken of common knowledge."[120] Oberle's opinions clearly assisted the jury in this matter. His testimony provided necessary context that allowed the jury to fully understand the motive for the crime. It was both relevant and helpful to the jury, and thus, was properly admitted.

Finally, Swilley argues in a conclusory fashion that Oberle's testimony was likely to confuse the jury and thus should have been excluded under MRE 403. To the contrary, Oberle's testimony clarified and explained the circumstances that motivated the crime. The probative value of the evidence was in no way substantially outweighed by any danger of confusion.

### D. PRIOR CONSISTENT STATEMENT

Like his codefendants, Swilley argues that it was improper to admit the recording of Youngblood's statement to Kahn as a prior consistent statement because Youngblood had a motive to lie at the time the statement was given. For the same reasons discussed in section II(C) of this opinion, we reject the argument.

### E. RELEVANCY

Also much the same as his codefendants, Swilley argues that gang-related evidence was irrelevant and therefore inadmissible. As has been explained, this evidence was relevant to the

his experience. Where an opinion is not based in a scientific methodology, it would usually make little sense to apply the *Daubert* factors. See *id*. Rather, the relevant reliability concerns "may focus upon personal knowledge or experience." *Id*. (quotation marks and citations omitted).

[115] *People v Bynum*, 496 Mich 610, 624; 852 NW2d 570 (2014).

[116] *Id*.

[117] *Id*. at 626.

[118] *Id*.

[119] *Id*.

[120] *Id*.

prosecutor's theory of motive. Evidence that Swilley was a member of a particular gang explained his motive for participating in the crime.

Swilley also contends that the events that occurred on December 25, 2012 were not relevant. As we have noted, these events explained how police came to find the Glock pistol. The incident also provided further support for the prosecutor's theory that the November 21, 2012 incident was part of an ongoing pattern of retaliatory gang violence. And while this evidence was certainly prejudicial to Swilley, there was no danger of unfair prejudice that would warrant its exclusion. The mere fact that the evidence was damaging is not sufficient to demonstrate error in admitting that evidence.[121]

## F. NEWLY DISCOVERED EVIDENCE

After trial, Youngblood authored an affidavit in which he stated he lied when he identified Swilley as one of the men involved, and that in fact, he did not see who was in the Saturn. Colley authored an affidavit in which he explained that Youngblood saw nothing and lied in order to gain favor with the prosecutor in regard to the Cass River Market incident. This Court remanded the matter to allow Swilley to pursue this claim in the trial court.[122] The trial court held an evidentiary hearing. After hearing Youngblood, Colley, and others testify, the trial court denied the motion for a new trial. Swilley contends that he was entitled to a new trial and that the trial court abused its discretion by holding otherwise. We disagree.[123] A trial court's decision on a motion for a new trial is reviewed for an abuse of discretion.[124]

To be entitled to a new trial because of newly-discovered evidence, a defendant must demonstrate:

> (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial.[125]

The trial court concluded that the second and fourth elements were not satisfied. Neither conclusion was an abuse of discretion. At trial, Youngblood initially testified that he did not see who was in the car. Thus, Youngblood's affidavit and testimony at the evidentiary hearing, in which he claimed not to have seen Swilley in the car, merely duplicated portions of

---

[121] *People v Murphy (On Remand)*, 282 Mich App 571, 582-583; 766 NW2d 303 (2009).

[122] *People v Swilley*, unpublished order of the Court of Appeals, issued February 23, 2016 (Docket No. 325806).

[123] In his supplemental brief, Granderson raises the same issue, relying on the testimony adduced at the evidentiary hearing. Our analysis of the issue applies equally to Granderson's argument.

[124] *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012).

[125] *Id*. at 313, quoting *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003).

Youngblood's trial testimony. It was also duplicative of Colley's testimony, in which he claimed that Youngblood never saw anyone in the car. Thus, the second element above was not satisfied.

Nor did the trial court abuse its discretion when it found that the fourth element was not satisfied. "[W]here newly discovered evidence takes the form of recantation testimony, it is traditionally regarded as suspect and untrustworthy."[126] Thus, "Michigan courts have expressed reluctance to grant new trials on the basis of recanting testimony."[127] This Court must give "due regard . . . to the trial court's superior opportunity to appraise the credibility of the recanting witness and other trial witnesses."[128] The trial court found that a different result was not probable because, after hearing Youngblood and Colley testify in an evidentiary hearing, neither was credible. Rather, the trial court found that Youngblood's statement to Kahn, which was admitted as substantive evidence at trial, was, "without question," more credible than Youngblood's testimony at the hearing. It was also fairly obvious why Youngblood would seek to recant his testimony – his fear that he and his family might be subject to retaliation. Given the trial court's superior ability to judge Youngblood's credibility, we cannot conclude that the trial court abused its discretion when it denied the motion for a new trial.

## G. JUDICIAL BIAS

Swilley contends that the trial court denied him a fair trial by exhibiting bias when it questioned Colley, Alesha Lee, and Phillip Taylor. We disagree.

Swilley presented an alibi defense at trial. Lee, Swilley's guardian and grandmother, and Taylor, who is Lee's fiancé, testified that Swilley was with them during the time of the shooting. According to these witnesses, Lee, Taylor, Swilley, and Swilley's sister went to City Hall to execute and record a quit-claim deed for a parcel of property at about 2:00 p.m. on November 21, 2012.

As explained by our Supreme Court, it is entirely proper for a court to question a witness in an effort to "produce fuller and more exact testimony or elicit additional relevant information."[129] That appears to have been the trial court's purpose with regard to Lee. The subject of the property transfer had been discussed during Lee's testimony, but no details regarding the transaction were elicited. The trial court sought to elicit these details. The trial court's questioning of Lee did not display disbelief. Nor does the record reveal a tone or demeanor that exhibited any bias to the jury.[130]

---

[126] *People v Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992).

[127] *Id*. at 560.

[128] *Id*.

[129] *Stevens*, 498 Mich at 173.

[130] See *id*. at 174-176.

The trial court's questioning of Taylor was much more extensive. Much like the trial court's questioning of Colley, it certainly appears that the trial court's intentions were valid. Taylor's own testimony had been confusing, and there were many unclear points. The trial court's desire to clear up these issues was understandable and entirely valid. However, many of the trial court's questions could have been interpreted as challenging Taylor's memory and veracity. Although likely unintentional, there is a possibility that the jury could have viewed the trial court's questioning of Taylor as having expressed an opinion on his veracity. That said, nothing in the record indicates that the trial court's tone with Taylor was argumentative or skeptical.

On consideration of the totality of the circumstances, however, Swilley was not deprived of a fair trial. As has been explained, the trial court questioned many witnesses, nearly all of whom were called by the prosecutor. The jury should not have been surprised that the court questioned Lee, Taylor, or Colley. And, importantly, the trial court provided instructions to the jury on multiple occasions that its questions were not meant to convey any opinions or to sway the jury. Such instructions were given while the trial court questioned both Colley and Taylor in response to objections that the trial court might be exhibiting bias. On this record, we cannot conclude that the trial court's conduct was so extreme that "no instruction [could] erase the appearance of partiality."[131] Accordingly, Swilley is not entitled to a new trial.

## H. GREAT WEIGHT OF THE EVIDENCE[132]

Swilley contends that the verdict was against the great weight of the evidence because evidence of gang activity and Swilley's connections thereto distracted the jury from the true issue, the shooting that left Galvin dead and Youngblood wounded. We disagree. "An appellate court will review a properly preserved great-weight issue by deciding whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand."[133] As has been explained, evidence of gang activity and Swilley's ties to the East Side, a.k.a. Right Back Blood Gang, was relevant to demonstrate motive. This did not distract the jury from the question of who participated in the shooting; rather, it helped the jury determine who was responsible. Swilley's contention is without merit.

## I. SENTENCING ERROR

Swilley, who was 16 at the time of the shooting, contends that his sentences for first-degree murder and conspiracy to commit first-degree murder violate MCL 769.25 and the United States Supreme Court's decision in *Miller v Alabama*, 576 US___, ___; 132 S Ct 2455, 2464; 183 L Ed 2d 407 (2012). Because Swilley's existing sentence for first-degree murder complies with MCL 769.25 and *Miller*, no relief is warranted regarding this sentence. With regard to

---

[131] *Id*. at 177-178.

[132] This and the remaining issues were raised in a brief filed pursuant to Administrative Order 2004-6, Standard 4.

[133] *Cameron*, 291 Mich App at 616-617 (quotation omitted).

Swilley's sentence for conspiracy, the trial court erred by sentencing Swilley to life without parole for this conviction because under existing precedent from our Supreme Court, Swilley's sentence must be life with the possibility of parole. Correcting Swilley's sentence in this regard alleviates any error under MCL 769.25 or *Miller*. That said, we doubt whether, in light of recent amendments to MCL 769.25, the penalty for conspiracy to commit first-degree murder remains life with the possibility of parole.

In *Miller v Alabama*, the United States Supreme Court held that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment."[134] After *Miller*, juveniles may still receive sentences of life without the possibility of parole. However, before imposing such a sentence, the trial court must "take into account how children are different, and how those differences counsel against irreovocably sentencing them to a lifetime in prison."[135]

In response to *Miller*, our Legislature enacted MCL 769.25, which provides, in relevant part:

> (1) This section applies to a criminal defendant who was less than 18 years of age at the time he or she committed an offense described in subsection (2) if either of the following circumstances exists:
>
> (a) The defendant is convicted of the offense on or after the effective date of the amendatory act that added this section [(March 4, 2014)].
>
> * * *
>
> 2) The prosecuting attorney may file a motion under this section to sentence a defendant described in subsection (1) to imprisonment for life without the possibility of parole if the individual is or was convicted of any of the following violations:
>
> * * *
>
> (b) A violation of . . . MCL 750.16, 750.18, 750.316, 750.436, and 750.543f.
>
> * * *
>
> (d) Any violation of law involving the death of another person for which parole eligibility is expressly denied under state law.
>
> (3) If the prosecuting attorney intends to seek a sentence of imprisonment for life without the possibility of parole for a case described in subsection (1)(a), the

---

[134] *Miller*, 576 US at ___; 132 S Ct at 2464.

[135] *Id*. at ___; 132 S Ct at 2469.

-29-

prosecuting attorney shall file the motion within 21 days after the defendant is convicted of that violation.

(4) If the prosecuting attorney does not file a motion under subsection (3) within the time periods provided for in that subsection, the court shall sentence the defendant to a term of years as provided in subsection (9).

* * *

(9) If the court decides not to sentence the individual to imprisonment for life without parole eligibility, the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years.

At sentencing, Swilley was sentenced to life without parole for both first-degree murder and conspiracy to commit first-degree murder. This was despite counsel's suggestion that these sentences were improper in light of MCL 769.25 and *Miller*. The trial court later resentenced Swilley, but only in regard to his murder conviction. Because the prosecutor had not sought a life-without-parole sentence, the trial court, in accordance with MCL 769.25(4) and (9), sentenced Swilley to a term of 37 to 75 years' imprisonment for first-degree murder. This sentence comports with MCL 769.25 and *Miller*, and thus, was not in error.

However, Swilley's sentence for conspiracy was not altered. As explained previously in this decision, under existing precedent from our Supreme Court, the proper sentence for conspiracy to commit first-degree murder is life with the possibility of parole.[136] Pursuant to *Jahner*, we remand the matter for correction of the judgment of sentence to clarify that Swilley's sentence for conspiracy to commit murder is life with the possibility of parole.

The remaining question is whether Swilley's sentence for conspiracy is subject to MCL 769.25. A violation of the conspiracy statute, MCL 750.157a, is not one of the offenses listed in MCL 769.25(2). However, pursuant to MCL 769.25(2)(d), the statute applies to "[a]ny violation of law involving the death of another person for which parole eligibility is expressly denied under state law." Thus, the first question to be answered is whether Swilley's conspiracy conviction is a "violation of law involving the death of another person . . . ."[137] Here, the conspiracy resulted in the death of a person. Thus, we conclude that the conspiracy to commit the murder was a violation of law that involved the death of another.

The second question is whether a defendant convicted of conspiracy to commit first-degree murder is expressly denied parole eligibility under state law. Having corrected Swilley's sentence to comport with *Jahner*, Swilley is eligible for parole. Thus, his sentence for conspiracy to commit murder does not fall under MCL 769.25, and there is no error under that statute. Nor is there error under *Miller*, which holds only that mandatory sentences for juveniles

---

[136] *Jahner*, 433 Mich at 504.

[137] MCL 769.25(2)(d).

of life without parole violate the Eighth Amendment.[138]   However, we believe that recent amendments to the relevant statutes lead to the conclusion that conspiracy to commit first-degree murder is now a nonparolable life offense.

In *People v Fernandez*, our Supreme Court considered whether a defendant convicted only of conspiracy to commit first-degree murder must receive a life sentence, and if so, whether that sentence must be with or without the possibility of parole.[139]   Our Supreme Court first examined MCL 750.157a.   Under this statute, one who conspires to commit an offense that is punishable by imprisonment of one year or more in prison "shall be punished by a penalty equal to that which could be imposed if he had been convicted of committing the crime he conspired to commit . . . ."[140]   The *Fernandez* Court explained that "the plain meaning of the language of [MCL 750.]157a and the legislative history of the provision support the conclusion that a person convicted of conspiracy should receive the same penalty as someone convicted of the target offense."[141]   The Court then turned to MCL 750.316, which, at the time, stated that one convicted of first-degree murder "*shall be punished by imprisonment for life.*"[142]   Reading these two statutes together, the Court reached "the inescapable conclusion" that "a person convicted of conspiracy to commit first-degree murder must be sentenced to life imprisonment."[143]

The Court then turned to the question of whether an individual convicted of conspiracy to commit first-degree murder is eligible for parole.   Here, the Court looked to MCL 791.234(4), the "lifer law."   Our Supreme Court noted that while this statute excluded those sentenced for first-degree murder from parole eligibility, it did not contain any such "exclusion for those sentenced to life for conspiracy to commit first-degree murder . . . ."[144]   The Court saw "no apparent reason in the 'lifer law' itself that would preclude the possibility of parole" for one convicted only of conspiracy to commit first-degree murder.[145]   However, it was the then-current practice of the parole board to deny parole to those convicted of conspiracy to commit murder, based on a belief that such individuals were, "like those convicted of first-degree murder, barred from parole."[146]   Rather than decide this specific issue, which had not been briefed by the parties, the Supreme Court remanded the matter for further proceedings in this Court.[147]

---

[138] *Miller*, 576 US at ___; 132 S Ct at 2464.

[139] *People v Fernandez*, 427 Mich 321, 326; 398 NW2d 311 (1986).

[140] MCL 750.157a; *Fernandez*, 427 Mich at 327.

[141] *Fernandez*, 427 Mich at 329.

[142] *Id*. at 330, quoting the then-current version of MCL 750.316 (emphasis in original).

[143] *Id*.

[144] *Id*. at 331 and n 4.

[145] *Id*. at 331.

[146] *Id*. at 333.

[147] *Id*.

The question of parole eligibility for those convicted of conspiracy to commit first-degree murder returned to our Supreme Court in *Jahner*.[148]  Examining the same statutes discussed in *Fernandez*, the Court concluded that because the defendants in *Jahner* were not convicted of first-degree murder, but only of conspiracy to commit first-degree murder, those defendants were eligible for parole.  This was because MCL 791.234(4) did not specifically provide that conspiracy to commit first-degree murder was a crime for which parole was not available.[149]

The lifer law, MCL 791.234, underwent several revisions after *Jahner*.  However, even in its current form, the statute does not explicitly mention conspiracy as an offense for which parole is not available.[150]  Thus, although the specific statutory language relied on in *Jahner* has been altered, arguably, the underpinnings of *Jahner* are not implicated by the various revisions to MCL 791.234.

However, MCL 750.316 has also been revised since *Jahner*.  Until 2014, MCL 750.316 simply stated that, as it had at the time of *Fernandez* and *Jahner*, one convicted of first-degree murder "shall be punished by imprisonment for life."[151]  But in 2014, our Legislature added crucial language to MCL 750.316.  Effective March 4, 2014, MCL 750.316(1) now reads:

> Except as provided in sections 25 and 25a of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.25 and 769.25a, a person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life *without eligibility for parole* . . . .[152]

Pursuant to MCL 750.157a(a), if a person conspires to commit an offense that is itself "punishable by imprisonment for 1 year or more, the person convicted under this section shall be punished by a penalty equal to that which could be imposed if he had been convicted of committing the crime he conspired to commit . . . ."  As explained in *Fernandez*, this language demonstrates that "a person convicted of conspiracy should receive the same penalty as someone convicted of the target offense."[153]  But unlike the language contained within MCL 750.316 at the time *Fernandez* and *Jahner* were decided, pursuant to the current language of MCL 750.316(1), first-degree murder "shall be punished by imprisonment for life *without eligibility*

---

[148] *Jahner*, 433 Mich 490.

[149] *Id*. at 497-504.

[150] MCL 769.234(6).

[151] See, e.g., 2013 PA 39.

[152] MCL 750.316(1), as enacted by 2014 PA 23 (emphasis supplied).  As is evident from the additional language referencing MCL 769.25, this amendment coincides with our Legislature's creation of the juvenile sentencing procedure provided by MCL 769.25.  2014 PA 23 was tie-barred to the passage of the bill that became 2014 PA 22.  Both were enacted and became effective on the same day, March 4, 2014.

[153] *Fernandez*, 427 Mich at 329.

*for parole*[.]" Were it not for *Jahner*, we would follow the same analytical model utilized by our Supreme Court in *Fernandez*, and read the current versions of MCL 750.157a and MCL 750.316 together. Doing so leads to the inescapable conclusion that one convicted of conspiracy to commit first-degree murder is not eligible for parole.[154]

This Court is mindful, however, that it lacks the authority to overrule our Supreme Court.[155] Rather, this Court "is bound to follow decisions by [the Supreme Court] except where those decisions have *clearly* been overruled or superseded, *and is not authorized to anticipatorily ignore [the Supreme Court's] decisions where it determines that the foundations of a Supreme Court decision have been undermined*."[156] This Court "may properly express its belief that a decision of [the Supreme Court] was wrongly decided or is no longer viable," but is not excused "from applying the decision to the case before it."[157] *Jahner* has not been overruled. Whether it has been superseded is a closer question. Although we are of the opinion that the 2014 amendment to MCL 750.316 compels a conclusion that conspiracy to commit first-degree murder is a nonparolable offense, we decline to deviate from *Jahner*'s holding unless and until it is overruled by our Supreme Court.

Following *Fernandez* and *Jahner*, the penalty for conspiracy to commit first-degree murder is a mandatory sentence of life with the possibility of parole. Because Swilley is eligible for parole, MCL 769.25 is not implicated. For the same reason, *Miller* is not implicated. As explained, the trial court satisfied MCL 769.25 with respect to Swilley's sentence for first-degree murder. Accordingly, other than the administrative correction of Swilley's sentence for conspiracy to life with parole, there is no error warranting relief.[158]

---

[154] One might imagine that if the phrase "without eligibility for parole" had existed in MCL 750.316(1) at the time of *Fernandez*, our Supreme Court would never have looked to the "lifer law" as it then existed to decide whether one convicted of conspiracy to commit first-degree murder was entitled to parole.

[155] See *Associated Builders & Contractors v Lansing*, 499 Mich 177, 191-192; 880 NW2d 765 (2016).

[156] *Id*. (emphasis in original).

[157] *Id*. at 192 n 33 (quotation and citation omitted).

[158] This result, however, demonstrates the incongruity of *Jahner* in the post-*Miller* landscape. Prior to *Miller* and the enactment of MCL 769.25, a defendant of any age convicted of conspiracy to commit first-degree murder in this state was subject to a lesser penalty than one who committed first-degree murder. In the post-*Miller* landscape, and with the understanding that conspiracy to commit first-degree murder is a parolable offense, a juvenile convicted of first-degree murder is entitled to the protections of MCL 769.25, and in most cases, will receive a term-of-years sentence. A juvenile who conspires to commit first-degree murder will be subject to the more severe, mandatory penalty of life in prison, albeit with the possibility of parole. This underscores the need for our Supreme Court to revisit *Jahner*.

## J.  INSTRUCTIONAL ERROR

Swilley raises several claims of instructional error, each of which lack merit.  Swilley first contends that the trial court erred by failing to provide Mich Crim JI 4.12.  This instruction, which is titled as an "optional clarifying instruction," allows the trial court to clarify precisely what crime a defendant is charged with by describing the crime and approximating the date the crime is alleged to have occurred.[159]  There was little need for such an instruction at trial, given that there was no dispute that the shooting occurred on November 21, 2012.  Regardless, the trial court instructed the jury multiple times that the crimes were alleged to have occurred on November 21, 2012.  Providing an additional instruction regarding the time of the offense would have been a needless exercise in redundancy.

Swilley next contends that the trial court's instructions regarding the crime of conspiracy failed to express the need for the prosecutor to establish that the defendants formed an agreement.  The trial court instructed the jury that in order to convict any of the defendants of conspiracy, the very first element that must be established is that "the defendant and someone else knowingly agreed to commit first-degree premeditated murder."  Clearly, the trial court did instruct the jury regarding the need for an agreement to commit the underlying crime.

Finally, Swilley contends that the trial court failed to properly instruct the jury regarding the elements of first-degree premeditated murder.  Swilley claims the trial court's instructions failed to "set forth the alleged act causing the death."  He contends that without such an instruction, the jury was not properly instructed that to convict on this charge, Swilley must have intended Galvin's death.  The trial court instructed the jury that to convict on this charge, it must find that "the defendant intended to kill DaVarion Galvin."  Thus, although the trial court did not include the specific act causing death in its instructions, it clearly instructed the jury that it must conclude that the defendants intended to kill Galvin.  Further, there was no dispute regarding the cause of Galvin's death.  The lack of a specific statement regarding the cause of death was of no consequence.

## K.  JURY OATH

Finally, Swilley contends that a new trial is required because the jury was not properly sworn before it began hearing testimony.  Contrary to Swilley's contention, the record demonstrates that the jury was sworn.  Swilley's argument lacks merit.

## V.  CONCLUSION

In Docket No. 325313, we affirm Granderson's convictions and sentences.

In Docket No.'s 325530 and 325806, we remand for the administrative correction of Thomas's and Swilley's sentences for conspiracy to commit first-degree murder.  The sentence

---

[159] See Mich Crim JI 4.12.

for conspiracy to commit first-degree murder must be life with the possibility of parole. We affirm in all other respects. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Peter D. O'Connell
/s/ Donald S. Owens